**Affirmed and Memorandum Opinion filed February 24, 2022.**



In The

# Fourteenth Court of Appeals

## NO. 14-19-00868-CR

### TELAVELL COLEMAN, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 338th District Court
Harris County, Texas
Trial Court Cause No. 1494344**

## MEMORANDUM OPINION

Appellant, Telavell Coleman, appeals his capital murder conviction that resulted in his life-without-parole prison sentence.   We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant was charged with the capital felony offense of capital murder for intentionally causing the death of Herman Browning by shooting him in the course

of also robbing him and others at a Houston Vietnamese restaurant.

The case went to trial. Before the presentation of evidence, the trial court, with the assistance of the attorneys picked a jury, and then the State's attorney gave his opening statement. Appellant's trial counsel lodged various objections during jury selection and the State's opening statement and requested a mistrial during the State's opening statement. The trial court overruled these objections and denied the request for mistrial.

Evidence at trial showed that a 57-year old man, Herman Browning was shot and killed during a robbery at a Houston Vietnamese restaurant. Witnesses in the restaurant all testified that two masked men entered the restaurant, that one was significantly taller than the other, that the shorter man collected money from the patrons while the taller one pursued the business's money. Several witnesses testified that a physical altercation ensued between Browning and the shorter assailant in connection with Browning's son's iPad.

Most eyewitnesses of the robbery recall two shots being fired. One of the four video surveillance cameras in the restaurant's kitchen contained an audio track, and the audio supported the conclusion that two gunshots were fired within five seconds of one another.

Dr. Darshan R. Phatak, the forensic pathologist that performed Browning's autopsy testified about his examination and conclusions about Browning's death. Phatak testified that Browning was killed by a gunshot wound of the chest. He testified that his discovery of a copper jacketed projectile in Browning's shirt, two wounds, an entrance and exit wound, led to his conclusion that he was struck by only one gunshot. Aided by the photographs of Browning's body, Phatak showed the jury the bullet's entrance, exit, and trajectory through Browning's body from his back left upper torso, towards the front of his body upward through Browning's

2

lungs and trachea. Phatak explained how Browning's lungs would have looked differently had Browning suffered a heart attack before being shot. Phatak further explained that the lack of soot, stippling, or a contact abrasion led to his conclusion that the gun was fired from at least three feet away from Browning, was not a gunshot fired at point blank range, or a close-range shot in the course of hand to hand combat. He explained that a wound of the kind shown, with perforations to Browning's lungs would have caused Browning to die of oxygen deprivation and hemoaspiration within five minutes. An officer who investigated the crime scene testified that the police did not look extensively for a second projectile and said that a second projectile easily could have been cleaned up in the debris.

Phatak admitted that he did not know whether Browning was standing up or lying down when he was shot, but explained how the trajectory was consistent with Browning lying on his side.

Video surveillance of the restaurant where Browning was shot showed a masked man wearing a black leather jacket, long pants and Nike shoes holding a handgun chase a man through the kitchen from one side to another, then the man ran back across the kitchen. Moments later on the same video, two loud sounds that could reasonably be perceived as gunshots are heard between five seconds of one another.

The man in the video, Victor Nguyen, testified that he was the owner of the restaurant, and that the man wearing black Nike shoes with blue shoelaces pursued him through the kitchen. He testified that he could not exit because a second door (not seen in the video) was locked. He testified the man ordered him "take me to the safe" and pushed him back to the register in the dining room area. Nguyen testified that he opened it for the man who stuffed cash into the pockets of his jacket. Nguyen testified that he then saw the man who had pursued him into the

3

kitchen shoot Browning in the back on his way out.

A week after the robbery, appellant was arrested with three other individuals at a vehicle stop wherein the driver of the vehicle, Enzo Ubadimma, fled from the police. At the time of his arrest, appellant was wearing black Nike shoes with blue laces and a prominent white swoosh which another passenger of the vehicle, Telia Alexander, who knew appellant well, testified that appellant wore all the time. In the back seat of the vehicle, the police discovered a black revolver, loaded, but with two chambers empty. Alexander also associated appellant with the black revolver. The State's ballistic expert testified that the projectile found in Browning's shirt was fired from the black revolver found in the back of the SUV in which appellant was found when he was arrested.

Alexander also stated that she first learned of the shooting at the restaurant from the news when she was at "Pat's" house on the night of the robbery. She testified that later Enzo picked up her and a friend, Dadriana Holmes (the fourth passenger at the time of the arrest). Alexander testified that appellant reported that "it was bad, and Little Mexico and a man was struggling" and that Little Mexico then appellant shot the man. Holmes also testified that appellant reported that "he shot [Browning] in the back and Little Mexico shot [Browning] in the face."

The jury found appellant guilty as charged, and the trial court sentenced appellant to confinement for life without parole.

## II. DID THE TRIAL COURT ERR IN TELLING PANEL MEMBER NO. 1 HE PROVIDED THE "WRONG ANSWER" TO HIS HYPOTHETICAL QUESTION?

Early in the jury selection process, while the trial judge was orienting the panel with the basic trial procedures, he selected a potential juror and employed the Socratic method to educate the panel about the presumption of innocence. The following exchanged occurred:

4

[Trial Court:] Okay. That's the end of the easy questions; they get hard now. I'm going to pick on [Panel Member No. 1] since you're first in line. Don't you love that? With the last name Anderson, I was always first in line. I feel your pain.

[Panel Member No. 1], let's say hypothetically I need a verdict right now on Mr. Coleman's case, and I'm going to help you out some. You've got to tell me he is either guilty or not guilty. You can't crawfish and say: Gee, I don't know, or I haven't heard the evidence. Let's say you had to pick one or the other hypothetically right now, which one would you pick?

[Panel Member No. 1]: No. 1. Guilty.

[Trial Court]: Wrong answer. Yeah. I bet you at least half you folks came in here thinking to yourself, I wonder what this guy did.

This exchanged prompted appellant's trial counsel's objection, which immediately followed:

[Defense Counsel]: Judge, just for the record, I am going to object to the Court's comment that it's the wrong answer. If that's his honest and true answer, that's all he's asked and obligated to do is tell you the truth. So if that's the truth, if he says "guilty," then we have to stand by that.

So I vehemently object to the Court's assertion that these jurors have to have a, quote, right or wrong answer. I think that's --

[Trial Court]: Counselor, are you telling me your client is guilty?

[Defense Counsel]: Judge, if that's how he feels.

[Trial Court]: Okay.

[Defense Counsel]: I want to hear from these people. I don't want these people in here thinking that they have to give a politically correct or a specific answer. He said "guilty."

[Trial Court]: Counselor, I got you. Objection is overruled.

After overruling the objection, the trial court immediately continued to add further explanation to his point:

So I bet you a lot of you folks came in here thinking, I wonder what

5

this guy did. It's kind of human nature to be thinking, what's he here for. I wonder what he did. I got an answer for you. Absolutely nothing until proved otherwise by credible evidence in this court.

So in response to Juror 1's question, it's not politically correct, it's constitutionally correct; because in this state, in this nation, if you are charged with a criminal offense, as Mr. Coleman is today, you enjoy what's called a presumption of innocence. Right now this man on trial is presumed to be not guilty. He's presumed to be innocent unless or until proven otherwise in the course of this trial.

So right now, I know about this much, as in zero, about this case other than perhaps what his name might be and what he is charged with. What I do know for a fact is that this man enjoys a presumption of innocence throughout the course of this trial unless and until it's proven otherwise by credible evidence called a presumption of innocence.

Now, this is not easy talk, or nice concept, good idea. It's the cornerstone of American justice; that in the state, in this nation, if you are charged with a criminal offense, you enjoy a presumption of innocence unless and until proven otherwise in the course of the trial.

So I've got a tough question for you, and it's the big question. I'll tell you a couple of times in the course of this process and when the case is finished that the man on trial is presumed innocent unless and until proven otherwise.

I need your response right now. Is this something you can accept and abide by, that he enjoys the presumption of innocence unless and until proven otherwise in the course of this trial? If you cannot do that, just say: No, Judge, I just think he's guilty. Let's just give him a fair trial and hang him right now. We don't do that here. It just doesn't happen. So if you can't give Mr. Coleman the constitutional presumption of innocence, let me know by a show of hands. Anybody, you just can't do that?

(No show of hands.)

[Trial Court]: And I know at least half of you walked in here thinking, wonder what he did? The answer is, again, absolutely nothing until proved otherwise in the course of the trial, called the presumption of innocence. That's state and federal constitutional law; that's your rights you're protecting; that's my right you're protecting; his right

6

you're protecting in trial today, presumption of innocence.

In his first issue, appellant complains that the trial court committed a reversible error in jury selection when it informed Panel Member No. 1 (and the rest of the panel members) that the answer he gave—in response to the judge's hypothetical question—was the "wrong answer" and thus denied appellant the right to a fair and impartial jury.

The Sixth Amendment to the United States Constitution guarantees a trial before an "impartial jury." U.S. Const. amend. VI. A defendant's right to a trial before an impartial jury is ingrained within our fundamental precepts of justice. *Armstrong v. State,* 897 S.W.2d 361, 368 (Tex. Crim. App. 1995) (citing *Irvin v. Dowd,* 366 U.S. 717, 721, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)); *see also In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). The voir dire process is designed to effectuate a defendant's right to a fair trial by insuring, to the fullest extent possible, that the jury will be intelligent and impartial. *Armstrong,* 897 S.W.2d at 368; *Drake v. State*, 465 S.W.3d 759, 763 (Tex. App.—Houston [14th Dist.] 2015, no pet.). We have recognized that "[t]he importance in selecting a jury cannot be overestimated in our judicial system since both the State and defendant have an interest in assembling a jury free of bias and prejudice." *Drake v. State*, 465 S.W.3d at 763 citing *Price v. State,* 626 S.W.2d 833, 835 (Tex. App.—Corpus Christi 1981, no pet.). Therefore, in resolving his first issue, we must determine whether the trial judge's actions and remarks cut off the vital flow of information from the jury to the court in such a way that it prevented appellant from having a fair and impartial trial. *Drake v. State*, 465 S.W.3d at 763-64; *United States v. Rowe,* 106 F.3d 1226, 1230 (5th Cir. 1997).

Comparing his case to this court's *Drake* opinion and the Fifth Circuit's

opinion in *Rowe*, appellant contends that like those cases the trial judge's remarks to Panel Member No. 1 had a chilling effect on the jury. We accept appellant's invitation to compare these cases to the instant case, but we conclude that the record in this case illustrates an entirely different experience by the panel members during voir dire.

In *Drake*, a panelist came forward stating that his religious beliefs prevented him from viewing evidence in a child pornography case. *Drake v. State*, 465 S.W.3d at 761-62. In the course of attempting to rehabilitate the panelist, the court stated, "So if it grosses you out, then you can take it out on the person in punishment because it can't possibly gross you out more than it grossed out that child. So that's what my God tells me. . .. If you get on this jury and I order you to look at something, you will get yourself locked up. So you want to find out what my God will tell me to do? Let's test it, Buddy. Let's test it." *Id*. at 762. When the panelist identified himself as a Jehovah Witness and added it was not his place to judge anyone else, the trial court stated "Jehovah can visit you in the jail," and ordered the baliff to arrest him. *Id*. The trial judge explained to remaining panel members her strong desire to empanel a jury that day (so as to avoid starting over the next day), and stated, "And I'm not playing, and I don't care if anybody likes it or not." *Id*. at 762-763. We reversed and remanded for a new trial after concluding that the trial court's conduct had "intimidated the jury into silence" during the jury selection process, and "undoubtedly influenced the jury's opinion about the case before it even began". *Id*. at 766.

In *Rowe*, the Fifth Circuit reversed a conviction based on exchanges that occurred between the judge and different venire panelists on the basis that "the trial court's actions cut off the vital flow of information from the venire to the court". *United States v. Rowe,* 106 F.3d at 1230. The first incident occurred after one

8

panelist approached the bench and reported that she could not be fair and impartial because she had family involved in law enforcement. The trial judge responded:

> All right. Put her on February, March and April's panel to come back. And you will be coming back again, and again, and again.... And see if you can figure out how to put aside your personal opinions and do your duty to your country as a citizen, because this kind of answer which is clearly made up for the occasion is not really great. You are excused.

*Id.* at 1128. The Fifth Circuit discerned this was in a manner that it was clear the other panel members overheard. *Id.*

The second incident occurred later when the court asked if any other venire panel believed whether their relationship with law enforcement would interfere with their ability to be fair and impartial. *Id.* One panel member explained her bias harbored against the defendant's presumption of innocence was based on her belief that when "the law enforcement agency has done [enough work] on somebody to get them here in court, they know what they're talking about." *Id.* She preceded her comment by stating, "I knew I was going to get myself into trouble." The court responded to the entire panel:

> It is appalling, actually, that you would come into a court, and presume that people were guilty because they were standing here charged with a crime. That's not our system. And apparently you will not, or you cannot follow the instructions of the court, so you're excused. Put her back on the jury panel for February, March and April, and perhaps you can take [sic] some remedial constitutional inquiries in the meantime. Does anyone else feel that these people are guilty, without hearing anything further? Now, I don't want to scare you into not responding. You will not be taken into custody. It is just hard, it's actually hard for me to believe somebody who stands up and says that they believe that because someone's sitting here that they're guilty already.

*Id.* at 1228-1229.

9

No hands were subsequently raised even after the court "attempted to undo the damage" by telling the panel members to raise their hands and give an honest answers if they were frightened, and promised that they would not be sanctioned. *Id*. 1299. Commenting on the panel's silence, despite the court's ameliorating remarks, the Fifth Circuit considered this "not surprising" and stated "we can [] presume that members of the panel are not fools". *Id*.

As we turn to the facts of this case, *Drake* and *Rowe* are inapposite comparisons. Viewed in context with the remainder of his discussion on the presumption of innocence, the judge chose Panel Member No. 1 for the purposes of engaging the panel (via Socratic dialogue) to teach the whole panel about appellant's right to a presumption of innocence. In stark contrast to the trial judge in *Rowe* who condemned the panel members' inability to apply the presumption of innocence as "appalling", the trial judge here stated that even if Panel Member No. 1's answer was "wrong" it was not uncommon, or something that particularly distinguished Panel Member No. 1 from the other panel members. ("I bet you at least half of you folks came in here thinking to yourself, I wonder what this guy did?"). In this case, Panel Member No. 1 was not punished or sanctioned. Nothing in the record, like the excused panel member in *Rowe* who stated she knew she would get into trouble, suggests that the panel members in this case suddenly became unable to respond freely and honestly.

We cannot conclude that anything about the court's dialogue with Panel Member No. 1, including its remark that his answer was incorrect, had a chilling effect on the panel or cut off the vital flow of information from the jury to the court in such a way that it prevented appellant from having a fair and impartial trial.

Accordingly, we overrule appellant's first issue.

### III. Did the trial court reversibly err in refusing appellant's trial counsel additional questioning during voir dire?

During appellant's trial counsel's questioning during jury selection, he provided a hypothetical example of felony murder, and explained the punishment range and parole-eligibility law for that crime, and then asked each panel member individually whether they would be unable to consider the maximum sentence—99 years or life imprisonment—for that crime. Fifteen panel members responded, "No." Then he asked whether they could "consider the low end, as little as five years in prison?" Forty panel members answered, "No."

After the trial court excused forty-one venirepersons pursuant to the parties' agreed strikes, eleven remained of those who had answered "no" to indicate their inability to consider the minimum range for the lesser included offense. When appellant's counsel sought to strike these panel members for cause, the court interjected: "My thought, Counsel, it was a very broad cross-question. We are going to clarify briefly, and if they remain true to their original decision, I will agree with you." The court then addressed the panel members on the issue:

> [Trial Court]: So my few remaining soldiers out there, we've got one more topic, and it's a real sticky topic because, truthfully, lawyers don't get it, judges don't get it. We ask you to figure it out and give us an appropriate decision. It's on the idea of lesser-included offenses.
>
> When [sic] talked about charged with the offense of capital murder, and if convicted, as charged, it's life without parole. [Appellant's trial counsel] then at the end talks about the possibility of lesser-included offenses. He mentioned two: One was felony murder, which is the, essentially, unintentional killing in the process of a felony; and he addressed also aggravated robbery, which is armed robbery, or serious bodily injury, a threat of death in the course of a robbery. Both of those cases are called first degree felonies. They both carry, if convicted, a minimum sentence of five years, maximum sentence of 99 years or life, there's an optional fine as high as $10,000.
>
> Let's talk about that. Five to 99 or life on a case. If we get a lesser

included, it will go to the jury to consider the appropriate sentence for the lesser offense that is not capital murder.

To qualify as a juror, you must say in good faith, I can consider the full range of punishment on the lesser offense if that's the issue. Let's talk about that.

Five-year minimum, call it 99 years, life maximum. I would suggest to you that the 5 and the 99, while part of the sentencing range, are the outliers. They are the highest and the lowest under the appropriate fact circumstance. We can sit here and create a hundred scenarios, mentally challenged people, if you're a party to a crime who's just the idiot in the backseat with the bad guys if the front seat, and there are ways we can probably say, well, couldn't you do this for us, or that for us.

My suggestion is this, and you don't have to comply with it. I'd like for you to have a tool box of sentencing, if we get there, of lesser includeds. The tool box is the full range of punishment. If it requires a minimum sentence, if it's unique like that, you give it the five-year sentence. If it needs the life sentence, if it's unique like that, you give it the life sentence.

I don't want a commitment other than, if I hear the appropriate facts, I'm willing and able to consider the full range of punishment on a lesser-included offense.

. . .

So that was pretty much of a one-week law school course in about six minutes. And what I want you to do is say, I can consider the full range of punishment if I'm given the unique circumstances, five or life, but I will not predetermine my potential sentence until I hear the facts, if we even get there on this case.

What I don't want to do is I don't want my conversation with you to influence your opinion. This has to be your decision whether or not you can take that full sentencing tool box into that part of the trial, if we even get there at the end of the trial.

So let's see who's left out there. And the question is: If which get to a lesser included, it will undoubtedly be a first degree felony, five-year minimum, life maximum. Would you be willing and able to consider the full range of punishment if you were given a lesser-included offense to consider as part of this trial? And your response would be,

yes, I can do that; or no, I cannot do that, and whatever you tell me, I'm perfectly fine living with.

Each of the remaining panel members who had initially indicated to appellant's trial counsel that they were unable to consider the full range of punishment for a lesser-included offense changed their answer to indicate that they could consider the full range. The trial court and the counsel then conferred, where the following exchanged occurred:

[Trial Court]: Guys, we have unanimous yes on lesser includeds now. Besides the ones we've already struck, what else is left to do?

[Prosecutor]: Nothing else from the State, I don't believe.

[Trial Court]: Nothing else from the State.

[Defense Counsel]: I guess I would ask one more time to put on the record who we believe had already been struck for cause.

[Trial Court]: If you want to run through those 50 numbers, you can. They've all been appropriately rehabilitated.

[Defense Counsel]: Well, just so the record is clear on the ones we believe have been rehabilitated.

[Trial Court]: Go ahead.

[Defense Counsel]: It's Juror Nos. 16, 18, 22, 27, 31, 33, 34, 39, 40, 50, and 65.

[Trial Court]: We did speak with those people after the fact posing a broader instruction, and they've all rehabilitated themselves that they would be able to consider the full range of punishment. I will not strike those jurors based upon their final responses.

Folks, you've got your list up there. God, I hate to [sic] it, you've got ten preemptory challenges. Let's just do that. We may not get any alternates. Let's do ten challenges right now per side.

[Defense Counsel]: Okay. Judge, again, just for the record.

[Trial Court]: Yes, sir.

[Defense Counsel]: After your rehabilitation, we would request additional time to revisit and talk to those jurors individually about what their answer was.

13

[Trial Court]: That will be denied, Counsel.

[Defense Counsel]: Thank you.

[Prosecutor]: Thank you, Your Honor.

In his second issue, appellant claims that trial court erred when it refused his trial counsel's request to ask follow-up questions to panel members rehabilitated by the court on range-of-punishment questions. He contends that this operated to deny his right to a fair and impartial jury. The State contends that appellant failed to preserve this issue for review. We first consider the State's preservation contention.

A trial court abuses its discretion during voir dire if the court prohibits a proper question about a proper area of inquiry. *Fuller v. State*, 363 S.W.3d 583, 585 (Tex. Crim. App. 2012) (citing *Sells v. State*, 121 S.W.3d 748, 755-56 (Tex. Crim. App. 2003)). "A question is proper if it seeks to discover a juror's views on an issue applicable to the case." *Id.* (quoting *Sells*, 121 S.W.3d at 756). To preserve error regarding the manner of voir dire, the record must reflect a proper, sufficiently specific, question that the trial court has not allowed venire members to answer and a ruling on the question. *Dhillon v. State*, 138 S.W.3d 583, 589 (Tex. App.—Houston [14th Dist.] 2004, pet. stricken) (concluding a proposed "general topic for discussion" was insufficient to preserve error regarding the court's refusal to permit additional questioning); Tex. R. App. P. 33.1(a)(1)(A). A trial court does not abuse its discretion, by restricting voir dire in a few limited circumstances, including when the questions are repetitious or duplicative. *See Dinkins,* 894 S.W.2d at 345; *Guerra v. State,* 771 S.W.2d 453, 467 (Tex. Crim. App. 1988); *Thompson v. State*, 95 S.W.3d 537, 544 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

In the absence of a proper question, appellant has not preserved error on this

14

record. First, we are challenged to find any *question* proposed. By asking the court for nothing more than "additional time to revisit and *talk* to those jurors individually about what their answer was" we are not reasonably assured that the trial court understood what question appellant sought to ask.

Second, even if appellant's trial attorney paraphrased a proposed question, it was not a *proper* question. A proposed question like "What was your answer to [the question that we asked you before]?" or "Tell me about your answer to [the question we asked before]?", without further explanation, could fairly be construed as duplicative and repetitious. *See Dinkins,* 894 S.W.2d at 345; *Guerra,* 771 S.W.2d at 467; *Thompson*, 95 S.W.3d at 544. To be sure, appellant did not propose to the judge that he wanted to ask the jurors individually why they changed their answers. Because our record shows nothing more than appellant's vague request for additional time to retread ground already covered during voir dire, the record lacks a proper question that the trial court has not allowed venire members to answer; the issue was not preserved for our review. *See Dhillon v. State*, 138 S.W.3d at 589.

Accordingly, we overrule the second issue.

## IV. DID THE TRIAL COURT COMMIT ANY REVERSIBLE ERROR IN CONNECTION WITH ITS RULINGS ON THE STATE'S OPENING STATEMENT?

Appellant's third issue is quartered: the first three parts is a triad of challenges to the court's overruling of three similar objections to three similar arguments made by the State in its opening statement; the fourth part is a challenge to the trial court's denial of his request for a mistrial after the court sustained appellant's counsel's fourth objection. Appellant argues that the trial court erred by overruling three objections and denying a mistrial on the fourth incident.

The purpose of an opening statement is to communicate to the jury a party's

theory of the case in order to help the jury evaluate the evidence as it is being presented. *Guillory v. State*, 397 S.W.3d 864, 868 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Article 36.01 of the Code of Criminal Procedure provides, "The State's attorney shall state to the jury the nature of the accusation and the facts which are expected to be proved by the State in support thereof." Tex. Code of Crim. Pro. art. 36.01(a)(3). A preliminary statement of what the State expects to prove is proper. *Marini v. State,* 593 S.W.2d 709, 715 (Tex. Crim. App. 1980).

The four relevant portions of the record, excerpts from the State's opening statement wherein the trial court overruled appellant's trial counsel's first three objections and (after sustaining the fourth) denied appellant's motion for mistrial, are provided below:

*First Overruled Objection*

[Prosecutor]: It was around the holiday season. You will see pictures of the inside of that restaurant. You will see that it was decorated with Christmas trees, Christmas lights. It was Lang Browning who provided those decorations.

See, New Years, unlike any other holiday on the calendar, is a holiday that we celebrate hope, that we put the past behind us, the last year behind us, and we celebrate --

[Defense Counsel]: Judge, I'm going to object to that. That is exceeding the scope of opening statement and it is now argument.

[Trial Court]: Overruled.

Again, as stated before, the statements by the attorney is [sic] not evidence.

*Second Overruled Objection*

[Prosecutor]: Thank you, Your Honor.

It's a unique holiday, one that we celebrate hope. We make resolutions. We look forward to the new year.

But it wasn't just New Year's that the Brownings were celebrating

16

that day. No, there were two other causes for celebration. The first, Phuong Nguyen, the owner of that restaurant, it was her birthday. Again, a time to celebrate. It was also Lang Browning's birthday.

This was a very joyful day filled with celebration. Yet, thanks to the greed and the callousness of the man sitting in this courtroom, Lang Browning no longer celebrates New Year's with hope. There is no future for Lang Browning.

[Defense Counsel]: Again, Your Honor, I hate to object, but he is exceeding the scope of proper opening statement and is doing argument, which is inappropriate and improper.

[Trial Court]: Thank you, Counsel. Objection overruled.

Again, jurors, the statement – opening statements by the attorneys are not evidence.

### *Third Overruled Objection*

[Prosecutor]: Ladies and gentlemen, at the end of this trial your verdict will have a profound effect on, both, the Browning family and on the Coleman family. But regardless of what you say, regardless of what you or anybody else does, nothing will bring Herman Browning back to his family; and because of that, at the end of this trial there will be no winners and there will be no losers. *We will be left with either justice or injustice*.

[Defense Counsel]: Objection, Your Honor. He is again exceeding the scope of proper opening statement and is making a closing argument, which is fundamentally improper and straight out wrong.

[Trial Court]: Thank you, Counsel. Overruled.

Again, jurors, the statements by the attorneys, including opening statements, are not evidence.

### *Denied Motion for Mistrial*

[Prosecutor]: Thank you, Your Honor.

At the end of this trial, we will be left with either justice or injustice. I'm going to ask you this apply your common sense to the evidence in this case and to the law in this case and understand that justice can be defined by only one word, nothing more, nothing less.

[Defense Counsel]: Again, Your Honor, I'm going to object. Again,

he is exceeding the boundaries of opening statement. Now, he's making a plea for law enforcement. The last time I checked, that is a [sic] argument to be made, if it is proper, at closing.

This is fundamentally, again, improper. And every admonishment from this Court that this is not evidence does not cure the prejudice and the harm that it is causing to my client at this point. So I again object.

[Trial Court]: I will sustain that particular objection.

[Prosecutor]: I understand, Your Honor. I will move along.

[Defense Counsel]: And I will ask the Judge to instruct the jury to disregard the last comment on the part of the prosecution.

[Trial Court]: Disregard the last statement from the prosecutor.

[Defense Counsel]: As a matter of law, Your Honor, I must move for a mistrial.

[Trial Court]: Denied.

Presuming without deciding that each of the objected-to comments fell outside the scope of 36.01(a)(3), that they were improper, and that the trial court erred in failing to sustain appellant's trial counsel's objections to these remarks, we consider whether the remarks were harmful; whether they had a substantial and injurious effect or influence on the verdict. In a similar analysis, we consider whether the court abused its discretion in denying appellant's motion for mistrial.

We review a trial court's rulings on opening statements for an abuse of discretion. *See Norton v. State*, 564 S.W.2d 714, 718 (Tex. Crim. App. [Panel Op.] 1978) (character and extent of opening statement subject to trial court's discretion); *McBride v. State*, 7 S.W.2d 1091, 1094 (Tex. Crim. App. 1928) (op. on reh'g); *see also Paroline v. State*, 532 S.W.3d 491, 495 (Tex. App.—Texarkana 2017, no pet.); *Donnell v. State*, 191 S.W.3d 864, 867 (Tex. App.—Waco 2006, no pet.). With respect to harm, in reviewing whether improper comments by the prosecutor during opening statement constitute reversible error, appellate courts have

determined whether, when viewed in conjunction with the record as a whole, the statement was so prejudicial as to deny appellant a fair trial. *Herrera v. State,* 915 S.W.2d 94, 97 (Tex. App.—San Antonio 1996, no pet.); *Brockway v. State,* 853 S.W.2d 174, 176 (Tex. App.—Corpus Christi 1993, pet. ref'd); *Sweaney v. State,* 632 S.W.2d 932, 935 (Tex. App.—Fort Worth 1982, no pet.). In carrying out this review, we will, as our sister court has done borrow from the *Mosely* framework adopted for evaluating whether an improper *closing* argument had a substantial and injurious effect or influence on the verdict, which includes consideration of (1) the severity of the State's misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the trial court); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Broussard v. State*, 01-08-00574-CR, 2009 WL 566935, at *4 (Tex. App.—Houston [1st Dist.] Mar. 5, 2009, no pet.)(mem op., not designated for publication) citing *Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (discussing harm analysis applicable to overruled objections under Tex. R. App. P. 44.2(b)). Whether a mistrial should have been granted involves these same considerations. *Temple v. State*, 342 S.W.3d 572, 617 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013).

Looking at the first comment, after the prosecutor gave a permissible illustration of the holiday décor, he states: "New Years, unlike any other holiday on the calendar, is a holiday that we celebrate hope, that we put the past behind us, the last year behind us, and we celebrate". This comment is not particularly severe, even if a building block to the prosecutor's later remarks. The second remark, particularly — "thanks to the greed and the callousness of the man sitting in this courtroom, Lang Browning no longer celebrates New Year's with hope.

19

There is no future for Lang Browning" — takes on an incendiary character; it is more severe misconduct because in essence, the State deters from the presumption of innocence without any reference to anticipated evidence. The third remark — "nothing will bring Herman Browning back to his family; and because of that, at the end of this trial there will be no winners and there will be no losers. We will be left with either justice or injustice" — is relatively neutral in isolation, but in context, having been built upon the previous remark that appellant is responsible for Browning's death (and his wife's hopelessness), implicitly invites the jury to serve justice to appellant before hearing any evidence. Each of these three remarks were improper, even if not equally so, because they were contrary to the defined purpose of the opening statement. *See Broussard v. State*, 2009 WL 566935, at *4. This factor favor's appellant's challenge.

The last challenged remark — the subject of appellant's motion for mistrial — follows along the same lines as the third comment as an implicit request to find appellant guilty in the absence of evidence. The severity of the prejudice likely caused by the remark was not independently greater than the previous comments. Considered in conjunction with the previous comments, the remark is slightly more severe as it ties together the State's string of remarks culminating in an ostensible plea for law enforcement without reference to anticipated evidence.

Ordinarily for an overruled objection, the second *Mosely* factor which considers the court's curative measures favors the appellant because in overruling an objection the trial court typically finds no reason to adopt curative measures. *See id*. ("[B]ecause appellant's objection was overruled, the trial court adopted no measures to cure the misconduct."). This case is somewhat exceptional in that regard because after overruling each of the first three objections the trial court promptly instructed the jury that the lawyers' arguments were not evidence. The

trial court also distanced itself from the State's line of questioning when it later sustained appellant's objection to the fourth comment which it asked the jury to disregard. The second *Mosely* factor only slightly favors appellant's challenge to the three objections.

With respect to the second factor in the context of the last comment, it is significant that appellant has not provided evidence that jury failed to follow the trial court's instructions. An instruction to disregard creates a rebuttable presumption that the jury followed the trial court's instructions. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005)(concluding instruction was followed where appellant had not pointed to evidence that the jury failed to follow the instruction); *Brokenberry v. State*, 853 S.W.2d 145, 151 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd)(concluding that when the trial court advised the jury that the State's opening statement was not evidence and instructed the to disregard regard, "[s]uch instruction was sufficient to cure harm."). Appellant has not presented evidence that the jury refused to follow the court's instruction to disregard.

The record of evidence presented at trial supports the capital murder verdict. The State firmly established through multiple witnesses that appellant entered the restaurant, and that he was the individual seen in the video chasing the owner in the kitchen. Overwhelming physical evidence corroborated the testimony placing appellant at the scene of the crime, as the taller of two robbers. Multiple sources linked appellant to the murder weapon. Holmes and Alexander both testified that appellant admitted facts demonstrating that he committed the capital murder. Two of the three eyewitnesses provided testimony upon which the jury could reasonably conclude appellant shot and killed Mr. Browning. Conflicting accounts about how many shots were fired, who fired shots, and what weapon was used to fire the shots

could have been reasonably resolved by the jury's credibility assessments.

Moreover, appellant has not drawn our attention to other errors occurring during the presentation of evidence, in the charge, in closing or otherwise that might affect the certainty of his conviction.

Although the State should not have engaged in jury argument during opening statement, considering the three factors discussed above as to each remark, we conclude that the argument did not have a substantial and injurious effect or influence on the jury's verdict and was, therefore, harmless. Additionally, after applying the foregoing factors to the statement made by the State, we hold the trial court did not abuse its discretion by denying appellant's request for a mistrial.

We overrule appellant's challenges to the court's rulings to his three overruled objections during the State's opening statement, and also overrule appellant's challenge to the trial court's denial of his motion for mistrial, (the fourth part of appellant's third issue). We thus overrule the third issue in its entirety.

## V. CONCLUSION

Having overruled each of appellant's three issues, we affirm.


/s/    Randy Wilson
        Justice

Panel consists of Justices Wise, Bourliot, and Wilson (Bourliot, J., concurs without opinion).

Do Not Publish — Tex. R. App. P. 47.2(b).